20-MJ-6670-MPK
20-MJ-6671-MPK
20-MJ-6674-MPK

## AFFIDAVIT OF FBI SPECIAL AGENT MICHAEL D. LITTLE III IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Special Agent Michael D. Little III, being sworn, state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since January 2019.  I am assigned to the gang squad in the Boston office, where I conduct complex criminal enterprise investigations against violent criminals involved in a myriad of criminal activities to include the illegal distribution of narcotics, firearm trafficking, and other violent crimes.  Prior to joining FBI, I spent five years as a police officer with the Metropolitan Police Department of Washington, D.C., where I worked as an undercover officer and vice investigator.  I conducted numerous drug investigations targeting violent criminals and received training on how to conduct drug investigations.

2.      Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. In the course of participating in investigations as it relates to drug trafficking, I have conducted or participated in surveillance; the controlled purchase of illegal drugs; the execution of search warrants; debriefings of subjects, witnesses, and informants; wiretaps; and reviews of consensually recorded conversations and meetings.  I have also received training through my position as a FBI Special Agent involving narcotics trafficking.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar

1

with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3.     Based on my training and experience, I know that it is a violation of Title 21, U.S.C. § 841(a)(1), for any person to knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.  I know that it is a violation of Title 21, U.S.C. § 846, for any person to conspire to violate the drug laws.  I am also aware that crack cocaine is listed as a Schedule II controlled substance, under the drug scheduling guidelines.

4.     I make this affidavit in support of a criminal complaint charging ANTHONY JACKSON (xx/xx/1991) with illegally possessing with intent to distribute, and distributing, Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1) on September 1, 2020.

5.     I also make this affidavit in support of an application for a search warrant for the premises located at 30 Wenonah Street ("St.") Apartment #2, Boston, Massachusetts, as more fully described in Attachment A-1 (the "TARGET LOCATION"), in furtherance of an investigation conducted by Special Agents[1] of the FBI.  Based on my investigation, the TARGET LOCATION is a residence that ANTHONY JACKSON uses and/or resides in.  As set forth below, JACKSON is involved in the distribution of illegal narcotics and there is probable cause to believe that the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 (the "TARGET OFFENSES"), further described in Attachment B-1, will be located at his residence, the TARGET LOCATION.

6.     I also make this affidavit in support of an application for a search warrant for the person of Anthony JACKSON, as more fully described in Attachment A-2 (the "Person to Be

---

[1] Special Agents and Task Force Officers working with the FBI are hereafter referred to interchangeably as "Agents."

Searched").  There is probable cause to believe that the evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, further described in Attachment B-2, will be located on his person.

7.     The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses.  This affidavit is submitted for the limited purpose of establishing probable cause to believe that JACKSON violated 21 U.S.C. § 841(a)(1) and to obtain the requested search warrant.  It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

## BACKGROUND OF INVESTIGATION

8.     The United States, including the FBI, is conducting a criminal investigation of Anthony E. JACKSON, also known as "Hollywood," "Wood," and "Ant," DOB xx/xx/1991, a twenty nine year old male, regarding violations of 21 U.S.C. §§ 841(a)(1) and 846.

9.     Since August 2020, members of the FBI and the Boston Police Department ("BPD") have been investigating drug trafficking by JACKSON in the Boston area of Massachusetts.  According to BPD, JACKSON is an active member of the St. James/Marcella Gang, a violent neighborhood street gang based in Boston.   According to BPD, the St. James/Marcella street gang operates a narcotics distribution network in and around the area of the St. James housing project and Marcella Street, located in Roxbury.  The St. James/Marcella gang and the St. Joseph gang, a second violent neighborhood street gang based in Boston, are involved in a gang war over drug trafficking territory.  This ongoing gang war resulted in an uptick of gun violence in Roxbury.  The gang's presence lowers the quality of life for the more than 1,000 innocent civilians residing in these neighborhoods.

3

10.    A check of the MA Board of Probation and Interstate Identification Index indicates JACKSON has state convictions for the following: Unlawfully Carrying a Dangerous Weapon (2008), Larceny from a Person (2008), Possession of a Class D Substance (2009), Carrying a Loaded Firearm (2010), Larceny Over (2012), Possessing a Firearm Without a Permit (2014), and Possession of a Class B Substance (2018), and has an open charge of Assault by Means of a Dangerous Weapon (gun) in the Roxbury Division of the Boston Municipal Court.

### USE AND RELIABILITY OF A COOPERATING WITNESS;
### IDENTIFICATION OF ANTHONY JACKSON AS A DRUG DEALER

11.    In the course of the investigation, a cooperating witness ("CW-1") conducted five consensually-recorded controlled purchases of controlled substances.  Recordings in connection with these transactions include recorded telephone calls between JACKSON and CW-1 and audio/video recordings of the controlled purchases of evidence.

12.    CW-1 has a criminal history including arrests for assault and battery with a dangerous weapon, breaking and entering, and distribution of Class A; CW-1 received continuances without a finding on charges of possession of a Class A substance, assault with a dangerous weapon, and threat to commit a crime.  CW-1 also has a history of drug abuse; however, CW-1 reports that CW-1 has been sober since July of 2013.  CW-1 has cooperated with law enforcement for over five years, and information provided by CW-1 has led to arrests for violations of the drug laws.  The information that CW-1 provided in this investigation and others has been corroborated and I consider the information provided to be reliable.  CW-1 receives financial compensation for CW-1's services for law enforcement.  JACKSON has been identified by CW-1 as a drug trafficker.

## PROBABLE CAUSE THAT JACKSON VIOLATED 21 U.S.C. § 841(a)(1)

## September 1, 2020 Controlled Purchase of 6 Grams of Cocaine Base from JACKSON

13.     On September 1, 2020, at approximately 12:53 pm, CW-1 placed a call to JACKSON at telephone number 857-312-2663 (the "TARGET TELEPHONE NUMBER") to arrange a purchase of cocaine base from JACKSON.  CW-1 knew that JACKSON used the TARGET TELEPHONE NUMBER for drug transactions.  This call was made in the presence of the undersigned Agent, was placed on speaker so that the Agent could hear it contemporaneously, and was recorded.  JACKSON answered the phone call and agreed to sell CW-1 seven grams of crack cocaine.  JACKSON told CW-1 to meet him at a location in Cambridge, MA.  JACKSON would later change the meet location to a gas station in Cambridge, MA.[2]

14.     In preparation for the controlled purchase, agents met with CW-1 at a prearranged meeting location.  Agents searched CW-1 and CW-1's vehicle for contraband (with negative results) and for money (CW-1 had $262 on CW-1's person, which the undersigned Agent permitted CW-1 to keep.)  The undersigned Agent provided CW-1 with $500 in Official Agency Funds ("OAF").  CW-1 was provided two audio/video recording devices. Both of these transmitting devices allowed law enforcement officers to contemporaneously see and hear, as well as recorded video and audio.  The undersigned Agent activated the audio/video recording devices and directed CW-1 to meet with JACKSON and purchase seven grams of crack cocaine.

15.     While under surveillance by law enforcement officers, CW-1 went to the agreed-upon location in Cambridge to meet JACKSON. CW-1 arrived at approximately 1:24 pm.  The surveillance team observed CW-1 stop and park at the agreed-upon location.  CW-1 placed a phone call to JACKSON.  Shortly after, law enforcement officers observed a black Nissan Altima bearing

---

[2] Details of the exact locations of drug transactions are omitted to shield CW-1's identity.

Massachusetts plate 1AZW53[3] arrive and park in front of CW-1's vehicle. CW-1 exited CW-1's vehicle and entered the front passenger door of the aforementioned Nissan Altima.

16.     The undersigned Agent observed, via electronic surveillance, that JACKSON was the driver of the Nissan Altima.  I had reviewed JACKSON's Registry of Motor Vehicles photo in connection with my investigation, and therefore was able to determine that the driver of the Nissan Altima was JACKSON.  JACKSON and CW-1 engaged in conversation. During the conversation, below-listed Agent observed, via electronic surveillance, JACKSON frequently looking back and reaching towards the rear passenger area of the vehicle. After the conversation with JACKSON, CW-1 exited the Nissan Altima and entered CW-1's vehicle.  The surveillance team observed JACKSON depart the area. CW-1 proceeded directly to a pre-arranged meeting location as directed by the undersigned Agent.  Law enforcement officers maintained surveillance of CW-1 out of the area of vicinity of Lansdowne Street and maintained surveillance of CW-1 to the pre-determined meeting location.

17.     Upon arriving at the pre-determined meeting location, CW-1 provided the undersigned Agent with a clear plastic bag containing an off-white rock-like substance.  CW-1 was searched for money and contraband, with negative results, except for CW-1's personal currency.  Agents field-tested the off-white rock-like substance provided by CW-1 using a TruNarc Raman Spectrometer.  The substance tested positive for the presumptive presence of cocaine base. In my training and experience, a positive test with the TruNarc Raman Spectrometer is usually consistent with the results later received from tests conducted by the Drug Enforcement Administration Laboratory.  The undersigned Agent placed the clear plastic bag containing off-white rock-like substance on a scale, and the bag including packaging weighed 6 grams.  The

---

[3] A query of this plate indicated that the Nissan Altima was a rental car.

controlled substance was sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

18.     The undersigned Agent debriefed CW-1. CW-1 told the undersigned Agent that after a brief conversation, CW-1 handed JACKSON $500 in OAF. After receiving the money, JACKSON opened the center console and retrieved a clear plastic bag containing a significant amount of off-white rock-like substance.  JACKSON then began breaking individual pieces of the off-white rock-like substance from the clear sandwich bag.   JACKSON then placed those individual pieces of the off-white rock-like substance onto a scale.

19.     The scale was located on the rear passenger seating area of the vehicle. After weighing the off-white rock-like substance, JACKSON then placed the substance in a clear plastic bag and tied the top. CW-1 was unable to see the weight displayed on the scale, however believed that the off-white rock-like substance weighed the agreed weight of 7 grams.   JACKSON then handed CW-1 the tied clear plastic bag containing off-white rock-like substance.

20.     The undersigned Agent reviewed the recording of this controlled purchase, and the video and audio quality are clear.  The undersigned Agent could clearly see JACKSON in the video, including JACKSON reaching to the rear passenger seating area of the vehicle and holding a clear plastic bag containing the off-white rock-like substance.

**September 8, 2020 Controlled Purchase of 3.75 Grams of Cocaine Base from JACKSON**

21.     On the afternoon of September 8, 2020, in an unrecorded phone call using the TARGET TELEPHONE NUMBER, outside of the presence of the undersigned agents, JACKSON agreed to sell the CW-1 seven grams of crack cocaine.

22.     On September 8, 2020 at approximately 3:00 pm, CW-1 placed a call to JACKSON at the TARGET TELEPHONE NUMBER.  This call was made in the presence of the undersigned

7

Agent and placed on speaker; JACKSON did not answer.  JACKSON texted CW-1 and indicated

that he was at work and could not talk on the phone.  Shortly after, JACKSON told CW-1 that he

was ready and to meet him at the same location.  I know, based on my experience and an interview

of CW-1, that JACKSON's reference to "the same location" meant that CW-1 was going to the

same area as the last transaction to meet JACKSON.

23.     In preparation for the controlled purchase, the undersigned Agent met with CW-1

at a prearranged meeting location.  The undersigned Agent searched CW-1 and CW-1's vehicle

for money and contraband with negative results, except that CW-1 had $40 in personal funds on

CW-1's person, which the undersigned Agent permitted CW-1 to keep.

24.     The below-signed Agent provided CW-1 with $700 in OAF. The below-signed

Agent provided CW-1 with an audio/video recording device. The below-signed Agent attempted

to activate the audio/video recording device. However, the device sustained technical difficulties,

as a result of which, there was no transmitting or recording of this controlled purchase.

25.     At approximately 3:03 pm, the below-signed Agent directed CW-1 to meet with

JACKSON and purchase 7 grams of crack cocaine. While under surveillance by law enforcement

officers, CW-1 went to the area of a gas station in Cambridge to meet JACKSON. CW-1 arrived

at approximately 3:30 pm.  At approximately 3:55 pm, CW-1 made contact with the below-signed

Agent and stated that JACKSON directed CW-1 to meet him at a nearby street.

26.     At approximately 4:02 pm, CW-1 arrived in the area directed by JACKSON and

entered his vehicle (the same Nissan rental car he used during the September 1 transaction).

Minutes later, JACKSON and CW-1 exited JACKSON's vehicle. Law enforcement officers

maintained surveillance of CW-1 as CW-1 traveled to the pre-determined meeting location.

27.     Once at the pre-determined meeting location, CW-1 handed the undersigned Agent $100 of excess OAF and a clear plastic bag containing an off-white rock-like substance. CW-1 was searched for money and contraband, with negative results besides the personal currency CW-1 was permitted to have. Agents field-tested the off-white rock-like substance using a TruNarc Raman Spectrometer. The substance tested positive for the presumptive presence of cocaine base. The controlled substance was sent to the Drug Enforcement Administration, North East Laboratory for additional testing.  The undersigned Agent placed the clear plastic bag containing an off-white rock-like substance on a scale and it weighed 3.75 grams including packaging.

28.     Agents directed CW-1 to call JACKSON to address him "shorting" CW-1, providing only 3.75 grams when he had agreed to provide 7 grams. In a call placed on speaker and made in the presence of the undersigned Agent, JACKSON told CW-1 that he believes that his scale is inaccurate.  JACKSON told CW-1 that he will give CW-1 the remaining crack cocaine that he shorted CW-1 the next time they met.

29.     After the transaction with JACKSON, CW-1 was interviewed and provided the undersigned Agent, with the following information: CW-1 arrived and entered JACKSON's vehicle. JACKSON said he was in a hurry because he was currently on the clock at work. CW-1 handed JACKSON $700 in OAF. JACKSON told CW-1 words to the effect of, "This is all I have on me, keep $100, I have to re-up after work."  Without weighing it first, JACKSON then handed CW-1 the tied clear plastic bag containing off-white rock-like substance.

30.     Based on my training and experience, I believe that when JACKSON said he needed to "re-up," he meant that he needed to obtain more drug supply.

**September 21, 2020 Controlled Purchase of 8.17 Grams of Cocaine Base from JACKSON**

31.     On the evening of September 21, 2020, in an unrecorded call made outside of the presence of the undersigned Agent, using the TARGET TELEPHONE NUMBER, JACKSON agreed to sell CW-1 seven grams of crack cocaine.

32.     In preparation for the controlled purchase, CW-1 met with agents at a pre-arranged meeting location.  The undersigned Agent searched CW-1 and CW-1's vehicle for money and contraband with negative results, except that CW-1 had $89 in personal currency on CW-1's person, which the undersigned Agent permitted CW-1 to keep.

33.     At approximately 08:15 pm, CW-1 placed a call to JACKSON at the TARGET TELEPHONE NUMBER.  This call was made in the presence of the undersigned Agent, placed on speaker, and recorded.  JACKSON answered and told CW-1 that CW-1 "can come to the hood." Shortly after, JACKSON sent CW-1 a text message and directed CW-1 to a gas station in the Roxbury area of Boston.

34.     The undersigned Agent provided CW-1 with $300 in OAF. CW-1 was provided two audio/video transmitting and recording devices and an electronic scale.  At approximately 08:25 pm, the undersigned Agent activated the recording devices and directed CW-1 to meet with JACKSON and purchase 7 grams of crack cocaine.

35.     At approximately 8:30 pm, the surveillance team maintained surveillance of CW-1 to the area JACKSON had directed.  CW-1 parked CW-1's vehicle in the parking lot of the gas station and waited for JACKSON's arrival.

36.     At approximately 8:57 pm, the surveillance team observed a black SUV bearing Massachusetts plate 1SWE75[4] enter the gas station parking lot and park directly next to CW-1's vehicle. CW-1 exited CW-1's vehicle and entered the black SUV. Law Enforcement officers

---

[4] A query of this plate indicated that the SUV was a rental car.

observed, via electronic surveillance, that JACKSON was the driver of the black SUV and the sole occupant of the vehicle.

37.     Law enforcement officers overheard, via electronic surveillance, JACKSON and CW-1 engaged in a transaction and conversation about drug prices. At the conclusion of this conversation, JACKSON told CW-1 to follow him because he had to retrieve additional drugs from his house.   At approximately 9:00 pm, the surveillance team observed CW-1 exit JACKSON's vehicle and enter CW-1's vehicle. The surveillance team maintained surveillance of CW-1 and JACKSON out of the gas station parking lot. At approximately 09:05 pm, CW-1 pulled over and parked on a side street a few blocks from Wenonah Street.  JACKSON exited his vehicle and approached CW-1's vehicle. The undersigned Agent overheard, via electronic surveillance, JACKSON tell CW-1 to wait in CW-1's vehicle until he returned.

38.     The surveillance team maintained surveillance of JACKSON as he got back in his vehicle and drove away. At approximately 9:07 pm, the surveillance team observed JACKSON pull into the driveway of 30 Wenonah Street in Boston (the residence in which the TARGET LOCATION is located) and enter the residence property. Moments later, the surveillance team observed JACKSON exit the property of 30 Wenonah Street, get in his vehicle, and back out of the driveway.  Agents maintained surveillance of him back to the location where he had left CW-1.  JACKSON parked directly behind CW-1's vehicle. CW-1 exited CW-1's vehicle and entered JACKSON's.  Agents overheard, via electronic surveillance, JACKSON and CW-1 engaged in a brief conversation. At approximately 9:13 pm, CW-1 exited JACKSON's vehicle, entered CW-1's vehicle and departed to the predetermined meeting location.

39.     CW-1 provided agents with two clear plastic bags containing a white rock-like substance.  Agents searched CW-1 for money and contraband with negative results besides the

personal currency CW-1 was permitted to have. Agents field-tested both clear bags containing the white rock-like substance using a TruNarc Raman Spectrometer. The substance in both bags tested positive for the presumptive presence of cocaine base. The undersigned Agent placed the two clear plastic bags containing the white rock-like substance on a scale, and they weighed a total of 8.17 grams including packaging.   The controlled substances were sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

40.     After the transaction with JACKSON, CW-1 was interviewed and provided the undersigned Agent with the following information: When JACKSON first arrived at the original location, CW-1 entered JACKSON's vehicle. JACKSON and CW-1 engaged in a brief conversation. At the conclusion of this conversation, JACKSON handed CW-1 a clear plastic bag containing a white rock-like substance.  CW-1 placed the clear plastic bag containing a white a rock-like substance on the digital scale that agents had given CW-1, and observed that it weighed 3.94 grams. CW-1 handed JACKSON $300 in OAF and told him that CW-1 would not leave until CW-1 received 7 grams.

41.     After this exchange, JACKSON told CW-1 he had to get the remaining drugs from his home and directed CW-1 to follow him. CW-1 followed JACKSON to a side street near the TARGET LOCATION, where CW-1 parked.  JACKSON exited his vehicle, approached CW-1's vehicle, and told CW-1 to wait.  JACKSON departed the area.[5]  JACKSON then returned to where CW-1 was parked, and CW-1 entered his vehicle.  JACKSON handed CW-1 a clear plastic bag containing a white rock-like substance. JACKSON and CW-1 both agreed to place the clear plastic bag on CW-1's digital scale, and CW-1 observed that it weighed 3.97 grams.  At the conclusion

---

[5]  Shortly thereafter, a surveillance team observed JACKSON pull into the driveway of the 30 Wenonah Street, enter 30 Wenonah Street briefly, and then exit 30 Wenonah Street.

of the transaction, CW-1 asked JACKSON if CW-1 could send him more customers.  JACKSON replied, "That's fine."

42.     The undersigned Agent reviewed the audio/video recordings of the transaction.  The audio quality is clear, however the video was too dark to depict the events. The undersigned Agent could hear JACKSON agree to sell CW-1 a quarter ounce (approximately 7 grams) of crack cocaine for $300. The undersigned Agent could also hear JACKSON confirm that he owed CW-1 for shorting CW-1 in the last transaction. The undersigned Agent could hear the sound of a bag or bags rustling and JACKSON say to CW-1, words to the effect of "look at that" followed by CW-1 saying "3.94." Based upon my training and experience, I believe this when JACKSON and CW-1 placed the substance on the scale. The undersigned Agent could hear JACKSON and CW-1 discuss further the quality of the drugs and the weight.  JACKSON also told CW-1 that he is willing to accept more customers, who are seeking larger quantities of crack cocaine.

**October 1, 2020 Controlled Purchase of 5.73 Grams of Cocaine Base from JACKSON**

43.     On the afternoon of October 1, 2020, on an unrecorded call outside of the presence of the undersigned Agent using the TARGET TELEPHONE NUMBER, JACKSON agreed to sell CW-1 seven grams of crack cocaine for $600.  Thereafter, JACKSON texted CW-1 from the TARGET TELEPHONE NUMBER and told CW-1 to meet him at location nearby the TARGET LOCATION.

44.     At approximately 12:53 pm, JACKSON called CW-1 from the TARGET TELEPHONE NUMBER.  This call was not recorded; however, it was answered in the presence of the undersigned Agent, on speaker.  JACKSON asked CW-1 where CW-1 was and if CW-1 was still coming to meet him.

45.     In preparation for the controlled purchase, agents met with CW-1 at a prearranged location.  The undersigned Agent searched CW-1 and CW-1's vehicle for contraband (with negative results) and for money (CW-1 had $43 on CW-1's person, which the undersigned Agent permitted CW-1 to keep).  The below-signed Agent provided CW-1 with $600 in OAF. The below-signed Agent provided two audio/video transmitting and recording devices. At approximately 12:58 pm, the below-signed Agent directed CW-1 to meet with JACKSON and purchase 7 grams of crack cocaine, and activated the recording devices.

46.     The surveillance team maintained surveillance of CW-1 to the area where JACKSON directed CW-1 to meet him. While en route to the buy location, CW-1 made contact with agents. CW-1 told agents that JACKSON called CW-1 and directed CW-1 to a different location.  At approximately 1:10 pm, JACKSON called CW-1 from the TARGET TELEPHONE NUMBER and changed the buy location to a location nearby the TARGET LOCATION.  Around this time, law enforcement officers observed JACKSON walking from the residence of 30 Wenonah Street (in which the TARGET LOCATION is located) and entering a white GMC SUV bearing Nebraska plate EDC0466.[6]  JACKSON was the driver and sole occupant of a white GMC SUV.  JACKSON drove directly to meet CW-1 on a nearby street.

47.     When JACKSON's vehicle arrived, CW-1 exited CW-1's vehicle and entered the front passenger seat of the white GMC SUV.  Law enforcement officers overheard, via electronic surveillance, CW-1 ask JACKSON for 7 grams of crack cocaine. JACKSON told CW-1 he only had 5 grams of crack cocaine on his person. Law enforcement officers overheard, via electronic surveillance, CW-1 and JACKSON engage in a brief conversation.

---

[6] A query of this plate indicated no license plate history on file.

48.     The surveillance team observed CW-1 exit JACKSON's vehicle and enter CW-1's vehicle. The surveillance team maintained surveillance of CW-1 as CW-1 left the area and drove to the predetermined meeting location.

49.     When CW-1 arrived at the meeting location, CW-1 provided agents three clear plastic bags containing white rock-like substance.   Agents searched CW-1 for money and contraband with negative results besides the personal currency CW-1 was permitted to have. Agents field-tested all clear bags containing the white rock-like substance using a TruNarc Raman Spectrometer. The substances in each of the three bags tested positive for the presumptive presence of cocaine base.  The below-signed Agent placed the three clear plastic bags containing the white rock-like substance on a scale, and they weighed 5.73 grams including packaging.  The controlled substances were sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

50.     CW-1 provided the undersigned Agent with the following information. CW-1 drove to the area near the TARGET LOCATION and waited for JACKSON.  When JACKSON arrived, CW-1 entered JACKSON's vehicle.  CW-1 engaged in a brief conversation, and at the conclusion of that conversation, CW-1 asked JACKSON for 7 grams of crack cocaine.  JACKSON indicated that he only had 5 grams of crack cocaine available and any additional drugs he had were for someone else.  But then JACKSON ultimately agreed to provide CW-1 with the additional drugs. JACKSON retrieved a clear plastic bag containing rock-like substance from his pants pocket and placed it on a scale.  JACKSON then retrieved two additional plastic bags containing white rock-like substance from his pants pocket, which he did not place on the scale. CW-1 handed JACKSON $600 in OAF.  JACKSON handed CW-1 the three clear plastic bags containing white rock-like substance to CW-1 in exchange for the $600.

51.     The undersigned Agent reviewed the audio/video recordings of the transaction.  The audio quality was clear; however, due to the way the recording device was angled, the video did not show the controlled purchase.  The undersigned Agent could hear JACKSON agree to meet CW-1 and give CW-1 specific instructions where to meet him. The undersigned Agent heard CW-1 ask JACKSON for 7 grams of crack cocaine for $600.  JACKSON and CW-1 discussed future drug transactions. JACKSON told CW-1 that he had "like 5" (the undersigned Agent believes JACKSON was referencing 5 grams) and owed CW-1 two more grams. CW-1 asked JACKSON if he had at least 1 to 1.5 grams more to fulfill the transaction. The undersigned Agent heard JACKSON tell CW-1 words to the effect of, "I was trying to save it for somebody, but I guess you can have it all... I just got someone else waiting for it, but you're more important to me."

52.     After the transaction with CW-1, JACKSON was observed by law enforcement parking the white GMC SUV in front of the TARGET LOCATION.  After parking the white GMC, JACKSON was observed carrying a black backpack and entering the right front passenger seat of a black Jeep SUV bearing MA registration 1VCW33. JACKSON then departed the area of the TARGET LOCATION.

53.     On October 1, 2020, an agent unfamiliar with the investigation administered a photographic array consisting of eight photographs to CW-1. The array included one photo of JACKSON and seven "filler" photos that were obtained from the Joint Automated Booking System (JABS).  The administering agent had no knowledge of the identity of the possible subject. CW-1 was read aloud the instructions from the Photo Array Check List, and the photos were presented in sequential order.  CW-1 identified the subject in photograph number five as "Wood," an individual CW-1 purchased crack cocaine from on numerous occasions; the undersigned Agent

16

believes "Wood" is short for "Hollywood," which I know to be a nickname for JACKSON. Photograph number five was a photograph of JACKSON.

**October 3, 2020 Controlled Purchase of 10 Grams of Cocaine Base from JACKSON**

54.     At approximately 8:45 a.m. on the morning of October 3, 2020, on an unrecorded telephone call made outside of the presence of the undersigned Agent, using the TARGET TELEPHONE NUMBER, JACKSON agreed to sell the Individual approximately 14 grams of crack cocaine for $1,000. At approximately 10:45 am, again using the TARGET TELEPHONE NUMBER, JACKSON contacted CW-1 and told CW-1 to meet him at a location near the TARGET LOCATION.

55.     In preparation for the controlled purchase, agents met with CW-1 at an agreed-upon location.  Agents searched CW-1 and CW-1's vehicle for money and contraband with negative results.  Agents provided CW-1 with $1,000 in OAF and provided CW-1 with an audio/video transmitting and recording device. Agents activated the audio/video recording device and directed CW-1 to meet with JACKSON to purchase 14 grams of crack cocaine.

56.     The surveillance team maintained surveillance of CW-1 to the area of the agreed-upon meet location. CW-1 arrived at approximately 1:00 pm. At approximately 1:05 pm, CW-1 called JACKSON and announced CW-1's arrival.  At approximately 1:09 pm, a surveillance team observed JACKSON leaving the property of 30 Wenonah Street, the residence in which the TARGET LOCATION is located, and enter a white GMC SUV.  JACKSON was wearing a black T-shirt and had a black backpack. JACKSON was the driver and sole occupant of a white GMC SUV.

57.     JACKSON drove directly to meet CW-1 on the nearby street.  JACKSON exited his vehicle and entered the front passenger seat of CW-1's vehicle. Law enforcement

officers overheard, via electronic surveillance, CW-1 and JACKSON engage in a brief conversation.  At approximately 1:20 pm, the surveillance team observed JACKSON exit CW-1's vehicle and enter the white GMC SUV. The surveillance team maintained surveillance of CW-1 out of the area and to the predetermined meeting location.

58.     CW-1 provided agents with one clear plastic bag containing white rock-like substance. Agents field-tested the clear bag containing the white rock-like substance using a TruNarc Raman Spectrometer. Agents searched CW-1 for money and contraband with negative results. The substances in the clear plastic bag tested positive for the presumptive presence of cocaine base. Agents placed the clear plastic bag containing the white rock-like substance on a scale, and it weighed 10.0 grams. The controlled substances were sent to the Drug Enforcement Administration, Northeast Laboratory for additional testing.

59.     CW-1 was interviewed by agents after the transaction with JACKSON.  CW-1 provided the following information: CW-1 drove to the agreed meet location and waited for JACKSON.  When JACKSON arrived, he entered CW-1's vehicle. CW-1 and Jackson engaged in a brief conversation.  At the conclusion of that conversation, CW-1 handed JACKSON $1,000 in OAF.  JACKSON removed a clear plastic bag from his person.  JACKSON placed the clear plastic bag on a digital scale, and the scale read 14 grams.  JACKSON handed CW-1 the clear plastic bag containing white rock-like substance to CW-1 in exchange for the $1,000.

60.     The below-listed Agent reviewed the audio/video recordings of the transaction.  The audio quality was clear; however, due to the way the recording device was angled, the video did not show the controlled purchase.  The below-listed Agent could hear JACKSON agree to give CW-1 the 1.5 grams of crack cocaine that he shorted CW-1 the last transaction. The below-listed Agent heard JACKSON tell CW-1 words to the effect of, "You see that shit, yeah I

did you right, that shit's some fire."   Based on my training and experience, I believe that when

JACKSON stated "that shit's some fire," that was a reference to the quality of the drugs that he

gave CW-1.  The below-listed Agent could hear JACKSON say to CW-1, "14."  I believe this was

the moment that JACKSON placed the clear plastic bag on a digital scale.[7]

## PROBABLE CAUSE THAT EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE TARGET OFFENSES WILL BE FOUND AT THE TARGET LOCATION

### Identification of the TARGET LOCATION as JACKSON's Residence

61.     JACKSON lists the TARGET LOCATION as his mailing address with the

Massachusetts Registry of Motor Vehicles.  In addition, surveillance observations have revealed

that JACKSON resides and operates out of 30 Wenonah Street, the residence in which the

TARGET LOCATION is located.

62.     On September 18, 2020, law enforcement officers conducted surveillance at 30

Wenonah Street.  The residence at 30 Wenonah Street has three mailboxes attached to the left side

of the residence.  Law enforcement officers were able to capture photos of the aforementioned

mailboxes. The last names of "JACKSON" and another individual ("PERSON 1") were displayed

on one of the aforementioned mailboxes. A utility inquiry revealed that PERSON 1[8] is paying the

electric bill at the TARGET LOCATION.

---

[7] After the controlled purchase from JACKSON on September 8, when he confronted by CW-1 about shorting CW-1
drugs, JACKSON admitted that he believed his scale was inaccurate.  Agents believe that the reading of "14" was
also inaccurate, given that directly after this transaction, the drugs weighed 10 grams on a law enforcement scale.
[8] PERSON 1, date of birth XX/XX/1962, mailing address 30 Wenonah Street Apt. #2, Boston, MA, 02121, is
believed to be a family member of Anthony Jackson. Open source research and MA RMV queries revealed an alias
of PERSON 1 with the last name "Jackson."



63.      As described above, on September 21, October 1, and October 3, 2020, among other dates, CW-1 conducted controlled purchases from JACKSON. On these three dates, law enforcement officers observed JACKSON depart the property of 30 Wenonah Street, in the vicinity of a side door that Agents believe leads up a common stairwell to Apartment 2, and proceed directly to meet CW-1 to facilitate the controlled purchases.

64.      On October 14, 2020, the FBI conducted surveillance in the vicinity of the TARGET LOCATION.   JACKSON was observed entering and exiting the property of 30 Wenonah Street on numerous occasions.

**Probable Cause That the Target Location Contains Evidence, Fruits, and Instrumentalities of the Target Offenses**

65.      Through my training, experience, debriefings with numerous drug traffickers, and consultation with other special agents and law enforcement officers, I have learned that:

a.   Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence and locations associated with them, including stash houses.  Specifically, individuals involved in drug

20

trafficking often maintain ledgers in order to keep track of the purchasing, storage, distribution, and transportation of drugs and/or the laundering of the proceeds of their drug sales.  Even after the drugs are sold and/or used, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions and to maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators.  In my experience, premises used by drug traffickers (including stash houses) often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

b.   Individuals involved in drug trafficking must often rely on others to obtain their drugs and/or the materials necessary to manufacture/distribute their drugs.  Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at premises associated with them and will maintain these types of materials even after drugs are sold or used.

c.   Individuals involved in drug trafficking often store controlled substances in their homes or other residences to which they have access.

d.   Individuals involved in drug trafficking often store articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

e.   Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances.  Drug traffickers often maintain these photographs at premises associated with them

21

even after drugs are sold or used.  Therefore, I am requesting permission to search for and to seize photographs that law enforcement agents determine to be of evidentiary value.

f.   Individuals involved in drug trafficking use various tools, instruments, materials and other paraphernalia to facilitate their trafficking, including weighing the drugs, packaging the drugs, and cutting the drugs. These types of materials include, but are not limited to: scales, cutting materials, and packaging materials.  These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used.  I am also aware that it is generally a common practice for traffickers to conceal at their locations large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences, even after drugs are sold or used.

66.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging

for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

67.     Based on my training and experience, and information provided to me by other agents, I know that individuals who illegally distribute controlled substances commonly use cellular telephones to communicate about and further their illegal activities.  They use their cellular phones in order to communicate with suppliers, potential buyers, or other individuals potentially involved in unlawful business transactions and will maintain information about these individuals in their contacts lists, in saved text messages and in other places.   These communications occur in a variety of ways, which include, but are not limited to: text messaging (often used in lieu of phone calls to avoid speaking over the telephone), and messaging through applications such as Snapchat, WhatsApp, and Facebook.

68.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B-1 and B-2's definition of "hardware") can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

69.     As described above, the investigation has uncovered evidence that JACKSON used his cellular phone associated with the TARGET TELEPHONE NUMBER during the commission of the offenses, to arrange drug deals with customers.  Based on my experience and training, I know that records relating to these communications, including text messages, are likely stored on his phone.

70.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

24

    d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

71.    Based on my training and experience, I know that individuals often maintain their cellular phones on their person or at their place of residence.

72.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises, and/or the Person to Be Searched, to press their finger(s) against the sensor of the locked device(s) or place the device(s) in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

73.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises and of the Person to Be Searched to the sensor of the device(s) or place the device(s) in front of their faces for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

25

## CONCLUSION

74.    Based on the foregoing, I submit that there is probable cause to believe that, on September 1, 2020 in Cambridge, MA, ANTHONY JACKSON did distribute and possess with intent to distribute Schedule II controlled substances, specifically cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

75.    Based on the foregoing, I also submit there is probable cause to believe that ANTHONY JACKSON has committed violations of 21 U.S.C. §§ 841(a)(1) and 846, and that evidence, fruits, and instrumentalities of the TARGET OFFENSES, set forth in Attachments B-1 and B-2, will be found in the TARGET LOCATION described further in Attachment A-1 and on the Person to Be Searched described further in Attachment A-2.

/s/ Michael D. Little III

_____
Michael D. Little III
SPECIAL AGENT, FBI

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on October 28, 2020.

M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS