UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **DOCKET NO. 20-10270-MLW** |
| | ) | |
| **ANTHONY JACKSON** | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

Anthony Jackson submits this sentencing memorandum to urge the Court to sentence him to a prison term of 18 months, followed by three years supervised release. For the reasons that follow Mr. Jackson asks this Court to vary from the guidelines. Such a sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

I.   HISTORY AND CHARACTERISTICS OF MR. JACKSON AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

   a. *Childhood and Upbringing*

At the time of his arrest, and in the months leading up to that arrest, Anthony Jackson was living with his mother in the Roxbury neighborhood where he spent most of his formative years. He has struggled with and been haunted by the negative influences he was exposed to in that neighborhood. Notably, in 2008, Mr. Jackson was a direct witness to the murder of a good friend. Qwa'mane Williams was the victim of a drive-by shooting on St. James Street in Roxbury.[1] Mr. Jackson was standing with Mr. Williams at the moment of the shooting and was able to hide behind a car and avoid being hit. He was present when his friend died, and those

---
[1] https://www.bostonherald.com/2008/06/20/teenage-homicide-victim-survived-earlier-stabbing/

1

moments have never left his mind. This was deeply traumatizing for him and he lived in fear for many years. Mr. Jackson told the probation department during the pre-sentence interview that it was Mr. Williams murder that led to his downward spiral. Notably, Mr. Jackson witnessed that murder in June of 2008. It was only one month later, July 2008, that Mr. Jackson's first serious adult arrest occurs, for possessing brass knuckles and resisting arrest. Over time, however, he has been able to distance himself from the people who brought him into this world.

      b. *Education and Employment*

Following the death of his friend, Mr. Jackson was disenrolled from High School and his family had to relocate for his safety. This caused a significant disruption in his education and Mr. Jackson was never able to obtain his high school diploma. After working at several short-term jobs over the years, in 2016 Mr. Jackson, obtained permanent long-term employment. He was hired at the Massachusetts Institute of Technology's cafeteria through Bon Appetit Management Company. At the time of his arrest, he was a permanent seasonal employee. He was a member of a union through Bon Appetit and the Front House Manager, Elizabeth Carlson, has been a stalwart supporter of him since the moment of his arrest. Mr. Jackson is a valued member of the team at MIT. Ms. Carlson has described him as getting along well with all of the staff and was on track to be promoted to the position of cook. PSR at paragraph 73.

This work dovetailed on his employment during his last significant term of incarceration at the Department of Correction, where he worked as a cook. The food industry is a fantastic career for him – he is good at it, he is respected, and he is going to return to that type of work.

      c. *Children*

Mr. Jackson is also the proud father of two children; his son, also named Anthony, and his daughter, Annalisse. He communicates with them as much as possible throughout this period of

incarceration. His son Anthony suffered a seizure at bath-time at the age of 3 while he was in Mr. Jackson's care. Mr. Jackson was terrified and called 911. The seizure appears to be an isolated incident by Mr. Jackson's pre-trial detention has been marked by worry about the well-being of his children. In May of 2019 the mother of his children, Annabell Colon, was arraigned on charges Assault and Battery with a Dangerous Weapon on a Child under 14. The victim in that case was Mr. Jackson's daughter Annalisse and another child. That case was resolved in September of 2021 with a Continuance without a Finding, but the injuries to Annalisse were severe. Following the investigation by the Department of Children and Families and the arraignment of Ms. Colon, the children were placed in Mr. Jackson's care for a thirty-day period, but then returned to Ms. Colon.

  d. *Substance Abuse and Circumstances of this Offense*

Despite the successes in his life, both as a father and in his career, Mr. Jackson has also struggled with substance abuse. He has largely kept this a secret from his family. The arrest described at paragraph 43 shows his arrest for a personal use amount of oxycodone, which is also consistent with the amount found in his bedroom during the execution of the search warrant in this case. PSR paragraph 17. Mr. Jackson's substance use history is described in paragraphs 67-70 of the PSR. Mr. Jackson's substance use and financial hardship were the driving force behind his decision to sell drugs in the fall of 2021. The offense conduct in this case sets out a total of five (5) controlled buys, detailed in paragraphs 10-17 of the PSR. This offense does not involve violence, gangs or a vast conspiracy. The facts of this case show a man who was selling crack cocaine to supplement his income and support his own addiction to opiates.

  e. *Future Plans*

Mr. Jackson is in a relationship with Tatyana Powell, who is employed at Boston EMS. Ms.

Powell is a very positive influence on Mr. Jackson and their relationship should give the Court cause to be hopeful for his rehabilitation. Ms. Powell very much encourages Mr. Jackson to play a positive role in their community. She knows that his success in the future is connected to his sobriety. Now that Mr. Jackson's addiction is not a secret, his family and loved ones can support him in a more meaningful way. He intends to continue this relationship with Ms. Powell, find employment in the food service industry and be an active participant in his children's lives.

II.     THE SENTENCING GUIDELINES

The Pre-Sentence Report (PSR) provides the Court with guideline range of 57-71 and an alternative guideline range of 21-27 months, based on the proposed change in the guidelines following the EQUAL Act, which seeks to rectify the historical disparity between the offense level in powder cocaine and crack cocaine. Mr. Jackson asks that the Court adopt the guideline range applying the offense level for powder cocaine for the reasons promulgated by the Department of Justice in its June 2021 Statement.[2] We base our 18-month sentence recommendation on the 'alternative' guideline range include in the PSR of 21-27 months, along with our argument that his criminal history score is overstated.

The alternative guideline range takes into account the long-standing challenges made by defendants for decades to the disparity found between crack and powder cocaine. Prior legislative efforts to date have failed to fully level the playing field.[3] The effects of that disparity

---

2 DOJ Memo
3 While the Fair Sentencing Act of 2010 greatly decreased the disparity in sentencing for defendants convicted of dealing powder cocaine versus those convicted of dealing crack cocaine,[3] there still remains a significant gap in sentencing for two forms of the same exact drug. In deciding whether a Guidelines sentence is "greater than necessary" to serve the objectives of sentencing, the judge may consider the disparity between the guidelines' treatment of crack and powder cocaine offenses. *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007). Although

have been born by African-American men. *See United States v. Whigham*, 754 F. Supp. 2d 239, 246-247 (D. Mass. 2010) (finding that any disparity between crack and powder sentences is inappropriate for the following five reasons: (1) the current cocaine Guidelines do not exemplify the Commission's exercise of its characteristic institutional role; (2) the assumptions about the relative harmfulness of crack and powder cocaine have not been borne out by the evidence; (3)

---

the 100:1 disparity at issue at the time of the *Kimbrough* decision has since been revised, **Error! Main Document Only.**the Sentencing Commission had concluded that the 100:1 ratio for punishment of crack/powder offenses rested upon assumptions about "the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that research and data no longer support." *Kimbrough* at 568, referencing, United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007), available at http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/drug-topics/200705_RtC_Cocaine_Sentencing_Policy.pdf (hereinafter 2007 Report). The Commission determined that the 100:1 ratio Congress embedded in the statute far overstated the relative harmfulness of crack cocaine, and the seriousness of most crack cocaine offenses. *Id*. For example, the Commission found that (1) crack is associated with significantly less trafficking-related violence than previously assumed; (2) the negative effects of prenatal crack cocaine are identical to the negative effects of prenatal powder cocaine and; (3) the epidemic of crack cocaine use by youth never materialized to the extent feared. *Id*. In addition, the Commission found that the Act's goal of punishing major drug traffickers more severely than low level dealers was not being met. "[T]he 100:1 ratio can lead to the 'anomalous' result that 'retail crack dealers get longer sentences than the wholesale drug distributors who supply them with the cocaine powder from which their crack is produced.'" *Kimbrough* at 568. The same anomalous result is true with a smaller ratio of 20:1.

The Commission found further that the crack/powder disparity "fosters disrespect for and lack of confidence in the criminal justice system" because of the widely held perception that it "promotes unwarranted disparity based upon race." *Id*. The severe sentences required by the 100:1 ratio are imposed primarily upon black offenders. *Id*. As result of these conclusions, the Commission recommended that the ratio be "substantially" reduced. *Kimbrough* at 568.  The EQUAL Act now proposes that the ratio be eliminated altogether.

the crack/powder disparity perversely tends to punish lower-level dealers more harshly than major traffickers because imported powder cocaine is converted into crack at a lower level in the trafficking hierarchy; (4) the 20-to-1 ratio still improperly uses the quantity ratio as a proxy for various kinds of harm and violence that may or may not come with trafficking of crack cocaine in a particular case; and (5) the crack/powder disparity fosters disrespect for and mistrust in the criminal justice system because of its disproportionate impact on African American defendants); *United States v. Gully*, 619 F. Supp. 2d 633, 646 (N.D. Iowa 2009) (finding that "the appropriate methodology is to use a 1:1 crack-to-powder ratio not just in an individual case or in a "mine-run" crack case, but in all "crack" cases"); *United States v. Lewis*, 623 F. Supp. 2d 42, 47 (D. D.C. 2009) (holding that there are "sound policy reasons for adopting a 1–to–1 ratio for all crack cocaine sentencings"); *United States v. Gardner*, 20 F.Supp.2d 468, 473 (SDNY 2014) (applying 1:1 ratio in sentencing).

     Mr. Jackson submits that a downward variance from this guideline range is warranted to account for the degree to which Mr. Jackson's criminal history score substantially over-represents the seriousness of his record. USSG Section 4A1.3(b). Mr. Jackson's criminal history score is 11, placing him in Criminal History Category V. The longest prison sentence Mr. Jackson has served was 3 years. That arrest occurred in 2012, nine years ago, when Mr. Jackson was 21 years old. He is now 32 years old. Furthermore, the convictions at paragraphs 40-41 of the PSR, each sentences of 18 months, both score separately for 3 points. While this is technically correct, those sentences ran concurrent with each other. This creates the illusion that Mr. Jackson's criminal history is more serious than it really is. Removing either paragraph 40 or 41 from the equation, Mr. Jackson's score would be 8, his Criminal History Category would be

IV and the guideline range 15-21 months. This range forms the basis for our recommendation of 18 months.

 III. A JUST SENTENCE

Pursuant to 18 U.S.C. §3553(a)(2), the court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Put simply, these four purposes of sentencing are punishment, deterrence, incapacitation, and rehabilitation. A sentence of 18 months, followed by a term of supervised release, will fulfill these goals.

There is no doubt that Mr. Jackson deserves to be punished for his conduct. Selling drugs, particularly from his mother's home, is conduct that has a negative impact on Mr. Jackson, his family and his greater community.

The requested sentence will also serve as an adequate deterrent to Mr. Jackson. He has had to remain in jail during this unprecedented pandemic. He knows if he re-offends, he will go back there, and for a much longer period of time at that. In terms of general deterrence, the recommended sentence shows others in the community that while the Court can show compassion for the safety of a defendant, COVID-19 is not simply a "get out of jail free" card for defendants. However, the 18-month sentence also shows the community that the Court can see the unfairness in punishment for crack cocaine cases that has adversely, and unfairly, affected the African-American community.

The final two purposes of sentencing – incapacitation and rehabilitation – will also be served by the requested sentence. Whatever danger to the community Mr. Jackson posed has been diminished. He has been removed from society. His eventual release will pose no danger to the public. A major motivator in his behavior – fueling his own drug habit – will be mitigated by his supervision. Mr. Jackson now has over a year of sobriety under his belt. He will be subjected to random drug tested and positive screens will result in swift consequences, but will also include opportunities for treatment, something that Mr. Jackson has never been able to avail himself of in a meaningful way.

## CONCLUSION

For these reasons, Anthony Jackson asks that he be sentenced to a prison term of 18 months, with three years of supervised release to follow.

> ANTHONY JACKSON
> By his attorney,
>
> */s/ Jessica P. Thrall*
> Jessica P. Thrall, BBO #670412
> Federal Defender Office
> 51 Sleeper Street, 5th Floor
> Boston, MA  02210
> Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 7, 2021

> */s/ Jessica P. Thrall*
> Jessica P. Thrall